## Case No. 5,090.

### The FREE STATE.

[1 Brown. Adm. 251;[1] 6 Am. Law T. Rep. 401; 5 Chi. Leg. News, 373.]

Circuit Court, E. D. Michigan.   April, 1873.[2]

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]
[2] [Affirmed in 91 U. S. 200.]

H. B. Brown, for claimant and appellant.

Geo. B. Hibbard, on the same side.

EMMONS, Circuit Judge. The grounds upon which the libellants demand an affirmance of the decree are that the Free State starboarded and ran into the Meisel after the latter had ported and showed her red light, and that the speed of the propeller was, under the circumstances, unlawful. In reference to the first, the district court found the facts against the libellant. We agree that the evidence shows the starboarding on the part of the propeller was before or nearly cotemporaneous with the porting of the Meisel, and that such movement on the part of the latter caused the collision. We shall not discuss the evidence upon this point. The facts will be stated only for the purpose of showing the reasons why we differ from the learned judge of the district court in reference to the application of the rule of law which requires a steamer in difficult navigation, or where, from any cause, there is "risk of collision," to slacken her speed.

The following facts, substantially stated in the opinion of the district court, are all which are necessary for the purposes of the present judgment. The Meisel was coming up the river between Malden and Bois Blanc Island, and near the Canadian shore. The propeller

Free State, well equipped, manned and lighted, with lookout, and officers well placed, was coming down somewhere near the center of said channel, at full speed. At the same time the steamer Cooke came up between the Meisel and the Canadian shore, and exchanging with the propeller the usual signals for so doing, they passed each other to the right. The Meisel, as the Cooke passed between her and the shore, starboarded, and then, if not before, displayed alone her green, and shut out from the Free State her red light. The wind was over the larboard quarter of the Meisel, and she had a clean run before her, in the course which the display of her green light indicated, of over half a mile. No other vessel was in the vicinity, and there was nothing to induce a suspicion on the part of the Free State that she would not run out the course upon which she had just entered, in circumstances rendering such duty imperative. As the Cooke passed the Free State, and while the Meisel was displaying her green light, indicating, as she was actually running, a course to the northwest, directly across that of the Free State, the latter, as was not only her right but her duty, starboarded, in order to pass the Meisel. While the ships were in this position, and in such close proximity as to make a collision inevitable from the movement, the Meisel ported, and displaying her red light to the propeller, ran across her bows, and was sunk so quickly as to result in loss of life. The instant the red light was opened to the Free State, every effort was made to arrest her progress. The morning had so far advanced that vessels could be seen a mile away. The atmosphere was clear, so that lights were in no way obscured. All the conditions of navigation were favorable for safety. It presents but the common case of a descending vessel meeting a ship without a circumstance to excite fear of collision. If the duty of slackening speed exists, it is only because the rule is universally applicable in all circumstances contemplated in article 13, even though the ships in fair weather meet in the open sea. Such a rule, counsel contend, the district court administered in this case, and more fully explained and illustrated in the case of The Milwaukee [supra]. It is insisted that both judgments, when taken in connection with the facts in this record, construe articles .13 and 16 of the act of 1864 [13 Stat. 60, 61] as imposing upon all steamships meeting end on, or nearly end on, the duty of both porting and slackening speed cotemporaneously. As a necessary result of such a rule, it is agreed a like duty is imposed upon all steamers meeting a sail vessel in circumstances demanding a change of course in order to avoid them. From this construction of the rules and all its consequences in practical navigation we are compelled to dissent. We can discover in the facts as we have stated them, no duty on the part of the Free State to slacken her speed, until the unfavorable presentation of the red light of the Meisel immediately under her bows suddenly prompted the attempt. As everything possible in the circumstances was then done, we hold her to be without fault.

So far as the practical administration of this principle is concerned in The Milwaukee [supra], we found no fault. In that case, from facts apparent to both masters, the courses were doubtful. It is with the argument, and some of the reasons of the judgment only, which we disagree. In the opinion of the district court, too, in this cause, we find it said the collision happened in the night, with the channel crowded with vessels. No such facts appear in the record before us, otherwise we should promptly affirm the decree. We think, in the application of this rule, there would be little difference between the district court and this. The necessity for the present discussion arises from the judicial argument in The Milwaukee, its citation in the present case in the opinion below, and its citation by counsel as a precedent here. It, by no means, follows that the learned district judge gave it any such extension.

Article 13 is as follows: "If two ships under steam are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other." Article 16 provides that "every steamship when approaching another ship, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse, and every steamship shall, when in a fog, go at a moderate speed." It is argued that the former provides the helm shall be put to port when vessels are meeting end on, so as to involve risk of collision; and, as article 16 uses like language in describing the cases when speed shall be slackened, both duties must be performed at the same time. Literally and irrespective of the former condition of the law, and of the exigencies of navigation, this is a logical conclusion. We think, however, this cannot be the meaning of these rules.

Upon principle we should have no doubt whatever in reference to their meaning. But in view of the history of their adoption by congress, we should deem the decision of the privy council, reversing the judgment of Sir R. Phillimore in The Jesmond and The Earl of Elgin. L. R. 4 P. C. 1, obligatory.

This act is but an adoption of the English rules sanctioned by act of parliament. They have sprung from much mutual consultation and political conference in both countries, and were intended to create a system common to the commerce of each. All the leading maritime powers of the world have adopted them. Were there much greater doubt than we apprehend exists as to their meaning, we have confidence the supreme court would follow for the sake of harmony the decision

of the privy council. It is at all events the duty of this court to do so. In that case the Jesmond and Elgin were meeting end on, and in the night, going at full speed. The former obeyed article 13, and ported. The Elgin, when so near that the movement inevitably produced the collision, starboarded, and was sunk so suddenly as to drown a large portion of her crew. Sir R. Phillimore held that article 16 imposed the duty of slackening speed at the same time, and in the same circumstances in which article 13 required the helm to be ported. He divided the damages therefore, upon the ground that the Jesmond was running at too great speed. His judgment was reversed upon appeal. There was full argument and consultation with the nautical advisors, and the rule clearly announced that where article 13 is obeyed, and there is nothing in the known conditions to lead either side to suspect a departure from it by the other, there is no duty to slacken speed, and article 16 has no application. It is said that article applies only where some known fact, or one which ordinary care might discover, indicates danger. It is with much emphasis said the risk of collision mentioned in it does not include those unexpected violations of law by an approaching ship which a good seaman would not anticipate, in the supposition that there was an experienced master in command.

The following decision, although not cited in The Elgin, is a full precedent for the judgment. The condition of the law, when it was decided, was substantially the same as after the statutory adoption of the rules in reference to porting and slackening speed. The Rob Roy, 3 W. Rob. Adm. 191. The Rob Roy ran down the Unicorn, going at full speed until she was in such close proximity that the attempt to stop was useless. The green light of the Unicorn being extinguished, and the red light hid on account of her course, she was mistaken for a sail craft. The Rob Roy ported as she should have done had the vessel been what the light indicated. Dr. Lushington excused the Rob Roy for not slowing her speed, because, he says, the lights which the Unicorn displayed indicated it was safe not to do so.

The following American decision, made since the adoption of the rules of 1864, is equally pointed,—The Scotia [Case No. 12,-513]: A sail vessel, in the night, was sunk by a steamer proceeding at full speed. The collision was caused by illegal lights and faulty movements on the part of the sail vessel. About a half million was involved, and the case obtained an elaborate examination. Judge Blatchford, for reasons too extensive to reproduce, held that articles 16 and 13 prescribed the duties of the parties. He says, "The Scotia kept on at 13 knots an hour," and subsequently that he "can discover no fault on her part." He says, in different circumstances he would have found the Scotia in fault for not slowing or stopping when she first discovered the light of the Berkshire, but the improper light on the latter made it proper for the Scotia to port when she did. On appeal, Judge Woodruff, affirming the decision of the district court, although differing with some of its reasoning in other respects, approved fully the portions we have quoted. He says: "The law before the statute was that declared by it; and therefore the rule as to slowing would be the same under the one as the other." He inquires: "Ought she to have slackened her speed sooner than she did?" Proceeding to answer the query, he says: "Whether the light she saw was on a steamer or on a sailing vessel, no duty to slacken speed or change the course of the Scotia arose until there was reason to apprehend a collision." "The suggestion that it was her immediate duty to slacken speed when she saw the light, assumes what in the first instance is not to be assumed. If she saw the light and observed it diligently, without having reasonable ground for apprehending a collision, no duty to slacken speed, or even to change her course, was created." He illustrates at length the policy of the rule which authorized the Scotia to act with confidence upon apparent indications, without any assumption that there was, or would be, any violation of law on the part of the approaching ship.

To these literally applicable and pointed decisions many may be added which, by their necessary assumption of the rule, are equally efficient in its support. It was not intended to change the "rule of the road," so far as any duty in this case was concerned, by the adoption of these articles. The regulations they establish are as old as steam and the modern improvements in navigation. The introduction of colored lights wrought no difference in their principle. They, by a certain indication of courses, made their application more easy. For all time since the matter came under judicial discussion it has been law, when vessels were meeting end on, to port the helm and go ahead with confidence. It is law, equally familiar and equally old, that when vessels of any kind are approaching each other, under circumstances which in any degree indicate to an experienced seaman risk of collision, they must slacken their speed, and, if necessary, stop. This statute being but a reiteration of these principles, must by the most familiar rules of interpretation be read in reference to them. They will be held to modify them only so far as their plain and express provisions compel.

That the old so-called "Golden Rule" of porting and passing to the right was established before the act of 1864. See St. John v. Paine, 10 How. [51 U. S.] 583; The Nimrod, 15 Jur. 1201; Story, Bailm. 611; The Duke of Sussex, 1 W. Rob. Adm. 274. The Rose [2 W. Rob. Adm. 1] lays down the rule stringently,—1 Pars. Adm. 569, and note 4, —and fully affirming the rule, see New York

Co. v. Navigation Co., 22 How. [63 U. S.] 461, citing some of the leading English and American judgments. The supreme court says the rule is well established. That when approaching each other in circumstances indicating danger of collision, it was the duty of steamers to slow before the adoption of article 16, is abundantly shown by decisions which are immediately cited for a slightly different purpose. Save in the case of The Elgin and Jesmond, The Rob Roy, and The Scotia, before cited, and a few others, judges have seldom taken pains affirmatively to assert the truism that vessels passing each other, where there are no apparent circumstances to indicate danger, need not slacken their speed. But this has been so universally assumed, the law should be deemed at rest.

In order to establish old maxims it is by no means necessary, and is often difficult, to produce cases where the precise point has been raised and adjudicated. In Calton v. Bragg, 15 East, 223, Lord Ellenborough said: "It is not only upon decided cases, where the point has been passed upon but also from the continued practice of the court, without objection made, that we collect the rules of law." In Smith v. Doe, 2 Brod. & B. 598, Lord Eldon, with much spirit, replying to what had been said at the bar, answered: "That the most enlightened judges who ever sat in Westminster hall always gave the greatest weight to what had obtained in practice." And see 1 Bl. Comm. 68; Ram, Legal Judgm. 12; Bennet v. Watson, 3 Maule & S. 1; Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539; U. S. v. Hudson, 7 Cranch [11 U. S.] 32; Briscoe v. Bank of Kentucky, 11 Pet. [36 U. S.] 257. A long list of concurring judgments, therefore, which necessarily involve a proposition, are as efficacious for its support as if it were affirmatively ruled.

A very large majority of all the decisions in reference to collisions, both English and American, assumed as well as settled this principle, that actual perceived danger alone demands the duty of slackening speed. The Cognac, Holt, Rule Road, 133: Two vessels approached end on. The one followed the rule and ported, but the other suddenly starboarded, and brought about the collision. Dr. Lushington pronounced against the offending ship, although the other was proceeding under full steam; no criticism whatever was made upon the rate of speed. The Concordia, Holt, Rule Road, 142: So far as this question is concerned, the facts are substantially the same as those in The Cognac. For a faulty starboard movement, the Concordia was condemned for the whole damage, although the other vessel was proceeding with rapidity up to the moment of the collision. The Mary Sandford [Case No. 9,225]: The argument is full to sustain the rule. The Wenona [Id. 17,411]: Justice Woodruff reversed the judgment of the district court, where a schooner with misleading lights, and which made a faulty starboard movement immediately preceding the collision, was run down in the night by a steamer going at full speed. In a judgment admirable for its clearness he demonstrates the legal right of the master of the Wenona to proceed in the confident presumption, not only that the schooner's lights were properly placed, but that she would pursue the course they indicated. The facts are so strikingly like those before us, that the judgment in the one case would equally apply in the other. In Lown. Col. 59 et seq., is an intelligent analysis of most of the leading cases where ships have been condemned for too great speed. His citations and comments abundantly show that the duty of slackening speed is dependent alone upon the exigencies indicating danger. The America [Case No. 281] is another instance of the condemnation of a vessel for a faulty movement in the immediate presence of an approaching ship, when both were proceeding at the usual rate, without any intimation of a fault on that account. New York Trans. Co. v. Philadelphia Steam Co., 22 How. [63 U. S.] 461. A steamer was coming up the Delaware with unabated speed, and ported in order to pass a tug with a tow attached by a hawser. The latter improperly starboarded, and a collision ensued. The supreme court held the steamer did its whole duty if she slowed and endeavored to stop as soon as she discovered the improper movement.

These few judgments are referred to simply to illustrate a mode of argument which may be successfully pursued through nearly all the great mass of decisions where ships at full speed have come into collision, and one has been condemned in the entire damages for sudden faults which could not be anticipated by the other. That those which are most illustrative have been selected, is not supposed. In the brief time allowed for the purpose, it is accidental if they are so.

A long list of judgments illustrating circumstances in which it is the duty of a steamer to slow, and demonstrating, we think, satisfactorily that they wholly exclude those contained in this record, has been analyzed in the instructive and thorough argument of the respondent's counsel. It has greatly aided the court. The length of our judgment prohibits what we had intended— its literal adoption. The perusal of these cases, with attention challenged to the argument that all of them with more or less force assume, that some affirmative evidence of danger must be present in order to impose the duty of decreasing speed, will result in a concession of the position: The Louisiana, 21 How. [62 U. S.] 1; The James Watt, 2 W. Rob. Adm. 271; The Birkenhead, 3 W. Rob. Adm. 75; Nelson v. Leland, 22 How. [63 U. S.] 48; Ward v. The A. Rossiter [Case No. 17,147]; Hall v. The Buffalo [Id. 5,927]; McCready v. Goldsmith, 18 How. [59 U. S.] 89; The New York, Id. 223; The

Bay State [Case No. 1,148]; The Northern Indiana [Id. 10,320]; The St. Charles, 19 How. [60 U. S.] 108; The Louisiana [Case No. 8,537]; The Electra [Id. 4,337]; The City of Paris, 9 Wall. [76 U. S.] 634. We have examined these judgments, and can say with confidence, they fully sustain the argument which the learned counsel has deduced from them. They show that if we hold in this case it was the duty of the Free State to slow, where every condition before her promised perfect safety in full speed, the judgment will stand without a fellow, unless it finds one in those which have been overruled. Benedict, Conkling, Parsons, Abbot, Angell on Carriers, in laying down the general rule, treat the judgments sustaining it in the same mode. If there be one elementary principle better established than another, we should say it is that which authorizes a seaman, having complied with every rule of navigation, in the absence of all indications of danger, to proceed with unabated speed, in full confidence that others would also perform their duty.

The obligation on the part of the Meisel to keep her course is as imperative as that of the Free State to keep out of her way. The statutory rules themselves, and the judgments already referred to in reference to the speed of the steamer, clearly affirm it. We add, however, a few adjudications more particularly discussing the precise duty. They all deny the right of this sail craft to return to her former course, after having selected another, immediately in front of an approaching steamer. The Wenona, before cited, goes quite beyond the necessities of this case. The Scotia [Case No. 12,512]; The Argus [Id. 521]; Whitney v. The Empire State [Id. 17,586]; Wakefield v. The Governor [Id. 17,049]; The Bridgeport [Id. 1,860]; St. John v. Paine, 10 How. [51 U. S.] 557; The Oregon v. Rocca, 18 How. [59 U. S.] 570; The Scotia [Case No. 12,513]; The Queen [Id. 11,502].

The Potomac, 8 Wall. [75 U. S.] 590, held a steamer faultless which was running nine miles an hour with no abatement of speed until just before the collision, although a sail vessel was run down, which suddenly changed her course and crossed her bows. The case is much like the present. See New York & L. U. S. Mail S. S. Co. v. Rumball, 21 How. [62 U. S.] 372; Baker v. City of New York [supra]; The R. B. Forbes [Case No. 11,598]; Amoskeag Manuf'g Co. v. The John Adams [Id. 338]; Camp v. The Marcellus [Id. 2,347]. These judgments and numerous similar ones also establish what results necessarily from the rule itself, that if the sailing vessel must keep her course, and it is the duty of a steamer to avoid her, the mode in which this is to be done is not to be closely criticised. The selection is wholly for the latter.

Having fully approbated the construction which authorized unabated speed in the circumstances of this case, we desire to call special attention to the conditions in which alone such a rule will be administered. The utmost diligence will be demanded in order to discover the earliest indications of danger, and prompt precautions required to avoid their consequences when known.

As we understand article 13, it is a duty to port before any risk of collision has accrued. It would be a fault for which a steamer could be condemned if she waited until there was actual danger, such as is required in article 16. They, by no means, contemplate the same circumstances, or prescribe duties to be performed at the same time. The former is to be understood as if it read as follows: "If two ships under steam are meeting end on, or nearly end on, so as to involve risk of collision, if their respective courses were continued, the helms of both shall be put to port, before any such risk is incurred, so that each may pass on the port side of the other." See The Nichols, 7 Wall. [74 U. S.] 656, which decides, the porting must be so early that no danger is incurred. If the rule had been so worded, it never would have occurred to Sir R. Phillimore that there was any analogy between it and article 16. The one would have commanded the duty of porting before any risk of collision arises; the latter that of slowing only where the risk has actually arisen. But the practical and judicial meaning of article 13 is precisely as if it so read, and it is therefore impossible that the two duties, that of porting and that of slowing, under the 16th article, can be contemporaneous. Such a result is deduced only by a mere literalism wholly overlooking the substantial mandate to port long before the exigencies arise which call for the duties demanded by article 16. This interpretation reconciles the rules and warns masters that they must port their helms at such safe distances, and accompanied by such watchfulness and care as would render wholly inapplicable the act of slowing their engines.

The Sunny Side [Case No. 13,620], just decided by this court, is an application of the same principle, for the justification of a sail vessel which, keeping her course under the rule, ran down and sank a tug. Both judgments are necessary for an understanding of the qualifications with which we would like to see the rule administered. A large number of experienced experts have been examined since the argument, and without exception old masters of sail vessels as well as steamers pronounce the suggestion of a duty to slow in such circumstances a novelty. It is one which is not performed on the one hand, or expected or desired on the other. All with great strength of preference declare in favor of holding both parties inexorably to the rules, and authorizing neither to anticipate a departure by the other until actual present

peril demonstrates that further adhesion is beyond all question dangerous. It is said a large majority of all collisions result from a too hasty decision that exigencies demand a deviation.

In the general principles of law we have announced, we have much confidence. Whether another tribunal in a disposition to divide a misfortune may not so criticise the conduct of the Free State as to impute some fault, we are less certain. But believing there is no greater discouragement to able officers, and no greater injustice to liberal owners who compensate them than those hypercritical judgments which demand a standard utterly impossible in practical navigation, and which are always announced in the interests of those but for whose wrongs the losses complained of would never occur, we have brought the steamer's conduct in this case to such a test only as we believe old and able mariners having a love for and a pride in their profession, would sustain. The ruling we make has the sanction of many such. Decree reversed and libel dismissed.